STATE of Missouri ex inf. John M. DALTON, Attorney General, Relator,

v.

RISS AND COMPANY, Inc., a Corporation, and Transport Manufacturing and Equipment Company, a Corporation, Respondents.

No. 45396.

Supreme Court of Missouri,

En Banc.

April 11, 1960.

Rehearing Denied May 9, 1960.

John M. Dalton, Atty. Gen., of Missouri, Fred L. Howard, Asst. Atty. Gen., Raymond S. Roberts, Special Asst. Atty. Gen., for relator.

John B. Gage, Laird P. Bowman, Kansas City, A. Alvis Layne, Jr., Washington, D.

C. (Gage, Moore, Park & Kreamer, Kansas City, of counsel), for respondents.

HOLLINGSWORTH, Chief Justice.

This is an original proceeding in the nature of quo warranto filed on January 25, 1956, by the Attorney General on behalf of the State of Missouri, in which he seeks judgment of ouster of respondents from further exercise of the corporate franchises heretofore granted them by the State of Missouri. The information alleges that pursuant to a common plan and conspiracy respondents Riss and Company, Inc., and Transport Manufacturing & Equipment Company, foreign corporations licensed to do business in Missouri, have willfully and continuously misused and abused the privileges so granted them by (1) repeated violations of the criminal laws and rules and regulations of appropriate state agencies; (2) failure and refusal to pay taxes and fees due the state; and (3) deliberate and constant violation of the motor vehicle maximum weight, size and registration laws, by reason whereof the state has been deprived of revenues in an amount exceeding $750,000.

The joint answer of respondents (hereinafter referred to, respectively, as "Riss" and "TM&E") denies any willful violation of the laws or regulations of this state or abuse of the corporate franchises granted them by the state; alleges (1) that any violations of regulations have been rare and unintentional, that the charges relating to violations of the motor vehicle registration laws arise out of a dispute as to the reciprocity provisions of the Missouri statutes and that respondents' construction of the meaning of those statutes was in good faith and predicated upon the advice of counsel; and (2) that the interpretation of Section 301.270 RSMo 1949, V.A.M.S., relating to the registration of motor vehicles operated by nonresidents upon the highways of this State, as contended for by relator, is violative of Article I, §§ 8 and 10, of the Constitution of the United States.

The Honorable E. C. Curtis, of Springfield, Missouri, was appointed Special Commissioner to take the testimony and to report the same with his finding of facts and conclusions of law. The evidence consists of 1,468 pages of testimony and 722 exhibits, which by diligent effort on the part of the Commissioner, aided by counsel for both parties, has been collated and condensed into a comprehensive final report. In that report, the Commissioner has found that the evidence fell into four separate categories, to wit: (1) nonpayment of personal property taxes; (2) violation of Public Service Commission regulations; (3) violation of laws relating to the size and weight of commercial motor vehicles operated within this State; and (4) violation of motor vehicle registration laws. As to the first three of these, the Commissioner found the evidence insufficient to sustain a finding of any studied plan on the part of respondents to deliberately flout the laws of the State in those respects. Relator, at least tacitly, acquiesces in that portion of the report. Consequently, the evidence on those issues will be omitted from further consideration. (There was also a considerable volume of evidence adduced and contention made with reference to the registration of *trailers,* as distinguished from the registration of *motor tractors,* which together comprise the unit by which property is transported by motor carriers. That evidence, however, had only an indirect bearing upon the alleged violation of the registration laws by respondents in the operation of their tractor-trailer units. Consequently, no discussion of the evidence relating to the registration of *trailers,* as such, is undertaken.)

Following a detailed analysis of the evidence relating to respondents' violation of the motor vehicle registration laws of this State, the Commissioner found respondents equally guilty of willful abuse of the franchises granted to them by the State of

Missouri and recommended that a writ of ouster issue as to each respondent, but that ouster be stayed upon condition of the payment of a fine by each respondent in the amount of $25,000 and the costs of these proceedings. Relator excepts to that portion of the report recommending a stay of ouster upon condition of payment of the fines suggested upon grounds that fines in that amount, under the evidence shown, would be grossly inadequate. Respondents except to the portions of the report adverse to their contentions and in their joint brief filed upon final submission contend as follows:

(1) This action should be dismissed because relator has failed to sustain his burden of proving the allegations of the information that respondents and each of them are guilty of a studied, persistent and continuing, willful and contemptuous refusal to abide by the laws of the State of Missouri;

(2) Even if relator's interpretation of the motor vehicle registration and reciprocity statutes of Missouri is correct, a writ of ouster should not issue nor a fine be assessed because respondents acted in good faith and had reasonable grounds to believe that the vehicles owned or operated by them were licensed in accordance with the motor vehicle registration and reciprocity statutes of Missouri; and

(3) Writ of ouster should not be issued nor a fine be assessed against respondents since such an order of ouster or fine would be violative of the federal constitution as imposing a penalty for violations of statutes construed in a manner rendering them unconstitutional.

During the period of time involved in this litigation, Riss was a Colorado corporation; TM&E an Illinois corporation. (In April or May, 1956, subsequent to the filing of the instant action, TM&E reincorporated in the State of Delaware.) Riss is also licensed as a foreign corporation in Illinois, Kentucky, Maryland and Oklahoma; TM&E in Kentucky, Maryland and Oklahoma. Both are owned and controlled by Richard R. Riss and members of his family and are operated under such common ownership and control. Both maintain their principal general office and business headquarters and keep all of their books and corporate records in Kansas City, Missouri.

Riss is a common carrier by motor vehicle operating under authority of the Interstate Commerce Commission over approximately 36,000 miles of highways in 22 states. The general area of its operations extends from Nebraska, Colorado, Oklahoma and Texas on the west and south to numerous points on the East Coast. It maintains offices in 19 states and the District of Columbia and operates, under lease from TM&E and others, 30 terminals and several garages in various states. TM&E owns certain terminal properties and other real estate, all of which it leases to Riss. It also owns and leases to Riss motor vehicle tractors and trailers for use by Riss in its operations as a common carrier.

Prior to 1954, Riss conducted its operations by leasing approximately 800 trailers from TM&E and by leasing tractors and some additional trailers from various individuals, referred to in the record as "owner-operators", who resided in many different states. The owner-operator leases provided that registration licenses should be issued by the state of the owner's residence and paid for by the owner. TM&E also owned and leased to Riss a few tractors and Riss owned a small number of tractors which it operated. All of the company-owned tractors, totaling 45 to 50, were, prior to 1954, licensed in Missouri.

In 1954, material changes were effected in respondents' methods of operation and motor vehicle registration policies. TM&E disposed of the motor vehicle equipment it then owned and purchased approximately 500 new tractors and 1,300 new trailers. All of these units were leased to Riss under long term leases, some of the leases giving

Riss the right of purchase. Delivery of these units commenced in May, 1954, and from the time the deliveries were completed Riss has conducted its operations primarily by use of these vehicles. TM&E does not lease to any one other than Riss and does not operate any of the units itself; neither does it make any profit under its leases to Riss. By the terms of these leases, Riss is required to pay all license fees, maintenance costs and personal property taxes on the leased equipment.

This action, to the extent now under consideration, involves the policies and methods pursued by respondents in the licensing of the motor vehicles operated by them upon the highways of this State since mid-1954. However, their policies and methods prior to that time are material in evaluating their actions and conduct during the period of time directly involved.

In the latter part of 1950, the State Highway Patrol began to make arrests of the drivers of Riss vehicles for violations of the motor vehicle registration laws of Missouri, the arrests being made principally in Phelps and Crawford Counties. The testimony was that these were owner-operated vehicles under lease to Riss. At that time, Section 301.010 RSMo 1949, V.A.M.S., (to which revision all statutory references herein are made unless otherwise indicated) defined the "owner" of a motor vehicle, required to be registered under the provisions of § 301.020, to mean "any person, firm, corporation or association, owning or renting a motor vehicle * * * for a period greater than ten days successively." Effective July, 1952, the definition of "owner" was redefined by statute to read: "[T]he term owner shall include any person, firm, corporation or association, who holds the legal title of a vehicle or in the event a vehicle is the subject of an agreement for the conditional sale or lease thereof with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the

conditional vendee or lessee, * * * then such conditional vendee or lessee * * *, shall be deemed the owner for the purpose of this law." Laws 1951, p. 696, § 1(19). (It is immaterial in this case whether Riss or TM&E is the "owner" of the vehicles involved. Concededly, one of them is.)

There seems to be some confusion as to the precise theory upon which the arrests were made. Officials of the Patrol testified that they made the arrests on the theory that Riss, by virtue of the location of its home office in Kansas City, was a Missouri resident and, as lessee for over ten days, was the owner for licensing purposes and, therefore, was required to obtain Missouri licenses for all vehicles operating upon Missouri highways. It is clear, however, that the Missouri officials were insistent that irrespective of whether Riss was a resident of Colorado or Missouri it was violating the laws of Missouri in operating any of its motor vehicles over Missouri highways without Missouri license plates.

Sgt. Dorsey Arnold (of the Patrol) estimated that these arrests totaled approximately 150 in the period from 1950 to 1952. During the time these arrests were in progress, numerous discussions were held between the officers of the Patrol and various attorneys representing Riss, at which Riss attorneys told the officers that the home office of Riss was in Colorado, later told them that Riss' home office was in Missouri, and later that Riss was a resident of several states in which it did business; that the attorneys for Riss also stated that one of the cases would be appealed or a declaratory judgment action filed and a final decision obtained as to whether (a) Riss was the owner of the leased vehicles for licensing purposes and (b) Riss was a Missouri resident; and that the Patrol was requested by attorneys for Riss to cease arrests until the matter was tested in the courts. William C. Dannevik, the executive vice-president and general counsel of Riss, testified that in 1951 a decision was reached to make a test case of one of

the arrest charges on an agreed statement of facts.

Awaiting action in that behalf, the Patrol stopped making arrests for a time. Stipulations of fact were agreed to by the prosecuting attorney and counsel for Riss in certain of the cases pending against Riss drivers. One of the cases was submitted to the court upon agreed facts and the remaining cases were held in abeyance. The submitted case resulted in a conviction and fine under date of October 23, 1951, from which no appeal was taken. Riss officials testified that the reason for not appealing was that, after the change in the statute defining the word "owner", they felt that the primary question involved in the driver arrest cases became moot. In any event, Riss paid the fine on November 3, 1953, and about the same time disposed of the other pending cases in a similar manner.

Following the change in the statute defining the meaning of the word "owner" in July, 1952, arrests of Riss vehicles fell off sharply and few arrests for improper licensing were made from that date until the middle of 1954. However, Major Edward Hockaday of the Highway Patrol testified that during that interim he had a conference in patrol headquarters with James T. Blair, an attorney for Riss, at which there was a general discussion of licensing in Missouri and Riss operations. Hockaday contended that Riss should not be operating tractors in Missouri with foreign licenses; Blair contended that Riss was correct in its licensing. It was agreed that Riss would file a declaratory judgment action in order, as stated by Blair, to clarify the law. Hockaday said that because of this understanding the Patrol again for a time let up on arrests of drivers of Riss vehicles for licensing violations.

In 1954, after Riss placed in operation the new tractors and trailers purchased by TM&E and leased to Riss, the Patrol again commenced making arrests of Riss vehicles bearing foreign licenses. Prior to and after the acquisition of these new vehicles there was a series of conferences between State officials and Riss representatives regarding the licensing of these vehicles. William C. Dannevik testified that prior to the delivery of the new vehicles he called upon Col. Hugh Waggoner, Superintendent of the Patrol, and Robert L. Hyder, Chief Counsel for the Missouri State Highway Commission, for the purpose of discussing his licensing problems. He said that at this conference he proposed to license Riss vehicles on a mileage prorata basis, registering in Missouri the percentage of vehicles that the miles traveled in Missouri bore to total system miles. Dannevik denied that he predicated his proposal upon an agreement to cease arrests, although he admitted that previous arrests were discussed. He said that Hyder told him he would consider the proposal, but later advised him that under Missouri law there could be no agreement to a distribution of licenses on a mileage basis.

Mr. Hyder testified that James T. Blair, then an attorney for Riss, was also present at the conference with Dannevik and that Dannevik and Blair proposed to license 75 additional tractors in Missouri if Hyder would agree not to prosecute Riss for licensing violations. He said that Blair and Dannevik also told him that Riss might withdraw all licenses from Missouri if the proposition was not accepted. With reference to another conference, Hyder stated that Blair requested the Patrol to stop arrests until a test case in the form of a declaratory judgment action could be filed by Riss. Hyder agreed to confer with Blair and to try to work out a stipulation of facts for such a suit, but did not agree to stop arrests. Nothing was ever done about working out such a stipulation and the next Hyder heard was that an injunction suit had been filed by Riss to enjoin arrests.

Col. Waggoner had several conferences with Dannevik and Blair. He testified that Dannevik proposed that Riss be permitted

to license its vehicles on a mileage pro-rata basis and that there be no further arrests. He told Dannevik that under an opinion of the Attorney General he had no authority to make any agreement permitting licensing on a prorata basis and that Riss must license in Missouri all its vehicles operating upon Missouri highways. Mr. Blair, who in 1957 became Governor of Missouri, testified that he and Dannevik proposed to license either on a mileage basis or a basing point system and that they offered to license a substantially larger number of vehicles than the Riss operation represented in Missouri if Riss would be "let alone" until the matter was settled, but that Hyder turned the proposal down.

Sgt. Arnold and Jay White, prosecuting attorney of Phelps County, testified that in 1954 and later in 1955 the attorneys representing Riss agreed to take an appeal from one of the arrest cases then pending. Mr. White and the Riss attorneys agreed to a stipulation of facts which was filed in one of the cases late in 1954, and White continued the other cases on the strength of the agreement to appeal if the result was adverse to Riss. A conviction did result in that case, but no appeal was taken. Convictions were later obtained in the other cases, but no appeal was taken in any of them and the fines were paid by Riss. Governor Blair testified that he advised Riss against an appeal because in his opinion it would not afford a proper test of the matters that were in controversy. Mr. Dannevik testified that Riss decided to file an injunction suit against the Highway Patrol to enjoin further arrests. Such an action was filed in the Circuit Court of Cole County on August 7, 1954. During an absence of the circuit judge from the county, a temporary restraining order was procured from the judge of the magistrate court of Cole County. That temporary restraining order was promptly dissolved by order of the circuit judge of Cole County on August 12, 1954, and on August 19, 1954, the action was ordered dismissed on grounds of failure of the petition to state facts sufficient to warrant injunctive relief. No appeal was taken.

On November 1, 1954, Riss filed a suit for injunction and declaratory judgment in the Circuit Court of Jackson County, whereupon the Honorable John F. Cook, Judge of Division Two of said Court, on November 3, 1954, without hearing, issued an order temporarily restraining the arrest of Riss drivers operating vehicles leased from TM&E and others and bearing license plates of the states in which they were domiciled. This petition and order were attacked by counsel for the Patrol and the other defendants because of lack of jurisdiction in the Jackson County Circuit Court. On September 12, 1955, that court was, by order of the Supreme Court of Missouri, prohibited from proceeding further in the cause. See State ex rel. Toberman v. Cook, 365 Mo. 274, 281 S.W.2d 777. During the period from November 3, 1954, until September 12, 1955, while the Jackson County injunction was in effect, Riss operated free from arrest on licensing charges.

On July 11, 1955, while the Jackson County case was pending in the Supreme Court, Riss filed in the Circuit Court of Cole County a suit identical to that pending in Jackson County. Dannevik explained this suit by stating that he had begun to doubt that the action in Jackson County could be maintained and that the case in Cole County was filed to make sure there would be no lapse in the restraining order if the decision of the Supreme Court should be adverse to Riss in the Jackson County case. The Cole County case was dismissed on January 20, 1956, for failure to plead over after a decision by the court that no cause of action was stated. Following the filing of the instant action on January 25, 1956, Riss appealed from that order on January 30, 1956. Attorney General Dalton testified that the suits filed were attacked by the State for the reason that they did not plead facts sufficient to properly present the issues and that he so

advised Mr. Robert Riss, the President of Riss & Company. On April 8, 1957, the Supreme Court affirmed the action of the trial judge in dismissing the action upon grounds of failure of the petition to state a cause of action. See Transport Manufacturing & Equipment Co. v. Toberman, Mo., 301 S.W.2d 801.

On October 27, 1954, after the first injunction in Cole County was dissolved, General Dalton received a letter from Robert Riss asking for a conference. This conference was set for November 8, 1954. Between those dates, the suit in Jackson County was filed and the temporary restraining order issued, the date of that order being November 3, 1954. General Dalton considered this a badge of bad faith. He testified that toward the end of the conference held on November 8, 1954, Mr. Riss stated that several of Dalton's friends would see him and tell him what type of people the Riss people were. Dalton said he then told Mr. Riss not to send any politicians to see him, but to bring the law and if they were right he would agree with them, but, if not, he would expect Riss to pay the taxes and licenses due the State of Missouri. Dannevik testified that General Dalton opened the conference with a statement to him not to send any politicians to Dalton's office, that he would talk to them on the basis of the law. Dannevik said the conference then continued and they discussed the licensing problems of Riss and that Mr. Riss requested an interpretation of the law by Dalton, but that Dalton said he could not give private citizens an interpretation of the law. Robert Riss denied that he told Dalton that several of Dalton's friends would call upon him in behalf of Riss.

General Dalton testified that on January 5, 1955, Senator Charles L. Madison, a member of the State Senate from Kansas City, called on him in connection with the Riss licensing problems and told him that if Dalton would "leave the Riss Company alone," Riss would license 200 tractors in Missouri. Dalton said that he replied that he had no authority to and would not compromise. Senator Madison testified that, at the suggestion of Mr. Riss, he did call upon General Dalton; that he told Dalton he appeared on behalf of a constituent and did not represent Riss as a lawyer. He said that he had a chance meeting with Mr. Riss in Kansas City and that Mr. Riss asked him to see Dalton on behalf of Riss & Company and told him that Riss & Company would license 200 vehicles in Missouri. Madison said that in his conference with Dalton he conveyed this information; that after Dalton explained the matter to him he felt "rather apologetic" and did not report back to Riss. Dannevik and Robert Riss denied any knowledge of Senator Madison's visit to Dalton and denied having ever talked to him about their licensing problems. Richard R. Riss, the former president and principal owner of Riss, testified that he jokingly mentioned to Senator Madison that Riss was having licensing trouble with the State of Missouri, but denied that he authorized Madison to see Dalton on behalf of Riss or to offer to license 200 tractors.

We turn now to consideration of the policies and practices pursued by Riss subsequent to mid-1954 in operating its tractor-trailer units upon the highways of Missouri in interstate commerce with registration licenses issued by states other than Missouri, which resulted in the arrest of many of the Riss drivers. When these tractors were acquired in 1954, respondents caused them to be registered and licensed as follows: New York, 298; Oklahoma, 56; Kentucky, 41, and Missouri, 96. In the first part of 1955, they were registered and licensed as follows: New York, 280; Oklahoma, 28; New Jersey, 28, and Missouri, 106. In 1956, the registration list showed: Pennsylvania, 279; New Jersey, 46; Oklahoma, 12, and Missouri, 156. In April or May of 1956, TM&E was reincorporated in the State of Delaware and all Pennsylvania tractor licenses

were transferred to Delaware, the stated purpose being to register the vehicles in the state of incorporation so that Missouri would afford reciprocity as to them.

The evidence showed that subsequent to July, 1952, the cost of tractor licenses in Missouri for the Riss vehicles was $600; in New York, about $200; in Pennsylvania, approximately $300; in Delaware, $250 to $350; and in Oklahoma, $120. The cost of licenses in Colorado, the state of incorporation of Riss, was not shown. (However, the evidence shows that Colorado has a ton-mile tax and that, therefore, there is no reciprocity between it and Missouri.) It was admitted by Dannevik that licenses were not purchased in Illinois, the state of incorporation of TM&E, because they were too high. It should also be here noted that, although Robert Riss had testified that he considered the "domicile" of owner-operated tractors to be the domicile of the driver of the vehicle, the evidence clearly shows that none of the company-owned tractors operated by Riss was ever "domiciled" in New York, New Jersey, Pennsylvania or Delaware. Some were "domiciled" in Ohio, Illinois, Michigan, Nebraska, Kansas, Colorado and Texas, but, even so, Riss did not buy registration licenses in any of those states.

A special check of Riss vehicles crossing Patrol weight stations in Missouri from 8:00 a. m., March 16, 1955, to 12:00 midnight, March 19, 1955, showed that of 165 Riss tractors crossing the scales in the four-day period, 92 had foreign licenses; and that of the 430 trips checked a total of 205 were made by vehicles bearing foreign licenses. Other evidence showed that of almost 35,000 trips made by company-owned vehicles in 1954 and 1955 and touching the State of Missouri more than 17,500 of them were made by tractors bearing foreign licenses.

Relator introduced in evidence copies of many thousands of "manifests", issued by Riss to its drivers, showing trips made by company-owned Riss vehicles on Missouri highways in 1954 and 1955 designated as "across state", that is, trips other than those originating in Kansas City or St. Louis and moving directly out of the State. These trips include both interstate and intrastate vehicle movements. These manifests reveal that in 1954 Riss vehicles made 3,189 across-state trips with foreign licenses attached to its tractors and in 1955 made 7,785 trips with foreign licenses. The instructions on substantial numbers of these manifests directed the driver to proceed via Highway 40 to Kansas City if the tractor did not have a Missouri license. Some directed the driver to use Highway 66 if the truck had Missouri or New Jersey licenses, otherwise to go through Kansas City on Highway 40. A few had instructions to by-pass Missouri scales or to go through when the scales were closed. (Most of the arrests in Missouri were made at the Patrol scales, principally on Highway 66 and not on Highway 40.)

In support of their assertion that their licensing policy has been in good faith, certain of respondents' officers testified that an executive committee was created within the Riss organization and given the responsibility of determining where the vehicles should be licensed. Robert Riss, a member of that committee, testified that reciprocity statutes are very complex and that the committee referred the question to the Riss legal department and made its decisions upon the advice of its legal counsel. Governor Blair testified regarding his personal views of the registration laws and particularly the reciprocity statutes, but there is no evidence that he advised Riss in accordance with the views he expressed at the trial. Mr. Dannevik also expressed his opinions on the subject. Both he and Governor Blair stated that the Missouri statutes *are broad enough to authorize* prorata registration and that this formerly had been the practice in Missouri. Mr. Dannevik testified that in 1954, after a general study of the problem, he concluded it was necessary that the vehicles be licensed in states to which other states would grant reciprocity and that as initially licensed Riss should have no

difficulty over the entire system. He stated that he conferred with Missouri officials before making his conclusions. He admitted, however, that after those conferences were concluded *he had some doubt that Missouri would recognize the registrations he planned to make.* (The Special Commissioner describes that admission as a "masterpiece of understatement.")

Richard R. Riss testified that at one time Riss had an agreement with the State of Missouri and the State of Illinois providing for an equal division between those states of license plates on Riss vehicles traveling between Kansas City and Chicago and also had a separate agreement of a similar nature with Missouri and Oklahoma. He was unable to give the names of the persons with whom he made the agreements, but stated that they were taken up through the Public Service Commission. He knew of no such agreement being entered into since January 1, 1950.

Governor Blair testified that a basing point and prorata system of licensing has been in effect in Missouri for many years *"without benefit of statute"* and that reciprocal agreements have been made which include both registration and Public Service Commission permits. He did not mention any specific agreements concerning Riss and said that any agreements made would be in writing. He admitted that the agreements had nothing to do with registration of vehicles under the law in effect during the period involved in this action and his testimony indicates that those agreements concerned registration fees as formerly collected by the Public Service Commission under a statute then in effect. None of the written agreements he referred to was introduced in evidence.

The deposition of John Randolph, former General Counsel for the Missouri Public Service Commission and later a member of that Commission, was introduced in evidence. He testified that certain agreements were made with Riss through conferences with Richard Riss and James T. Blair. Although he stated that these agreements involved both registration and P.S.C. permits, he admitted that neither he nor the Public Service Commission had any authority to make reciprocity agreements regarding registration and later stated positively that the only agreements he made involved P.S.C. permits, and·those alone. He did say, however, that he conferred with the Commissioner of Motor Vehicles at the time the agreements were made, so that "it would all be in agreement"; that the Commissioner of Motor Vehicles at times participated in the conferences and that the purpose was to work out a uniform licensing. He said that the Highway Patrol was also advised of all such agreements. He testified that he knew of no agreement between Riss and the State of Missouri to the effect that licenses on Riss vehicles traveling from Kansas City to Chicago would be divided equally between Missouri and Illinois. He also testified that the Public Service Commission recognized principal offices of motor carriers in other states and granted reciprocity to companies such as Riss for vehicles fully licensed in states where a principal office was located. By "fully licensed" he said he meant P.S.C. licenses and also registration.

In support of their contention that registration fees based upon a prorata basis constituted *a fair and equitable method,* respondents introduced in evidence: (1) a copy of an eleven-state reciprocal agreement (to which Missouri is not a party) wherein the states involved have agreed to recognize registration of interstate vehicles; (2) evidence tending to show that in 1955 the total system miles traveled by Riss equipment was 54,735,470 miles and that the total of Missouri miles traveled was 4,942,-250 miles—substantially 9% of the total; (3) that 101 of their tractors were out of the state for a period of 90 or more consecutive days, the total being 122 of such occasions; and (4) that in 1955, of a total of 90,303 trips, only 26,791 touched this State.

In support of their assertion that the motor vehicle licensing law as construed by re-

lator is unconstitutional as an undue burden on interstate commerce, respondents offered extensive testimony in the form of exhibits and oral evidence. This evidence consisted of proof of the cost per mile to Riss for its operations over toll roads in different states; the maintenance and operational costs of some of the toll roads; the construction costs and repair and maintenance expense of certain Missouri highways; the miles traveled by Riss trucks in Missouri and the amount of payments made by Riss to the State of Missouri. By a series of calculations, respondents concluded this proof establishes that, if relator's theory of the proper interpretation of Missouri registration laws is adopted, respondents would pay the State of Missouri in highway taxes per mile an amount disproportionate to the cost to the State of maintaining and operating its highways.

■ Sections 301.020 and 301.270, as they existed prior to repeal and re-enactment in 1957 (new §§ 301.020 and 301.271), set forth the law of Missouri relating to registration of motor vehicles operating upon the highways of Missouri during all of the time here involved. Section 301.020, insofar as pertinent, provided:

"*Every owner of a motor vehicle or trailer,* which shall be operated or driven upon the highways of this state, *except as herein otherwise expressly provided,* shall file * * * an application for registration * * containing: (1) a brief description of the motor vehicle to be registered * * *; (2) the name, residence and business address of the owner of such motor vehicle." (Emphasis supplied.)

The exception above emphasized, as contained in Section 301.270, reads:

"A nonresident owner, except as otherwise herein provided, owning any motor vehicle which has been duly registered for the current year in the state, country or other place *of which the owner is a resident* and which at all times when operated in the state has displayed upon it the number plate

or plates issued for such vehicle *in the place of residence of such owner* may operate or permit the operation of such vehicle within this state * * *, provided that the provisions of this section shall be operative as to a vehicle owned by a nonresident of this state only to the extent that under the laws of the state, country or other place of residence of such nonresident owner like exemptions are granted to vehicles registered under the laws of and owned by residents of this state." (Emphasis supplied.)

The latter section grants such reciprocity, upon the conditions therein set forth, to the owner and not to the vehicle. Thus it is clear that to be entitled to reciprocity (1) the owner must be a nonresident of Missouri and (2) the vehicle must be currently registered in the state of which the owner is a resident.

Respondents insist, however, that § 301.-270, when read with certain other statutes "in pari materia and cognate therewith," is fairly subject to an interpretation that the terms "resident" and "nonresident" mean *commercial* "resident" or "nonresident" and that vehicles properly registered in states of the commercial residence of a corporation are not required to be licensed in Missouri under said reciprocity section. They cite in support of that contention the following cases: City of St. Louis v. Temples, Mo.App., 149 S.W.2d 888; State v. Brunow, Mo.App., 320 S.W.2d 80; State v. Tustin, Mo.App., 322 S.W.2d 179; and Rummel v. Peters, 314 Mass. 504, 51 N.E.2d 57. In Temples, the St. Louis Court of Appeals held an ordinance of the City of St. Louis, under which the city had levied a license tax upon a motor vehicle owned by a Missouri corporation having its principal office in Sikeston and operated out of a freight terminal in St. Louis, was so worded as to apply to any owner whose truck was regularly engaged in business in the City of St. Louis. Brunow was submitted upon an agreed statement of facts. The court noted and emphasized the agreed statement and held that, based on such an agreed statement, the operator of the for-

eign motor vehicle there involved was exempt from prosecution for unlawful operation in Missouri within the exemptions of a reciprocal agreement existing between Missouri and Iowa. The peculiar situation presented in Brunow was noted in our recent case of Transport Rentals, Inc. v. Carpenter, Mo.Sup.1959, 325 S.W.2d 745 (to which we will advert), wherein we held that Brunow was authority only upon the basis of the facts therein stipulated. In Tustin the Springfield Court of Appeals, in 1959, held that the fact of the sole operation of the business of a Delaware corporation in the State of Indiana justified holding it to be a resident of Indiana and entitled to reciprocity in the operation of a motor vehicle in Missouri. The decision in that case is directly in conflict with Transport Rentals, Inc. v. Carpenter, supra. The Massachusetts case, Rummel v. Peters, supra, was decided on the basis of the specific language of a Massachusetts statute. (See also in this connection 60 C.J.S. Motor Vehicles § 68, page 248, which notes the holdings of the Massachusetts courts construing the registration statutes of that state.) For reasons hereinafter stated, none of these cases is controlling or persuasive that Missouri's reciprocity statute is fairly susceptible to the interpretation contended for by respondents.

Respondents have also cited in support of their contention that they are residents of each state in which they purchased licenses the following cases: City of St. Louis v. Wiggins Ferry Co., 11 Wall. 423, 78 U.S. 423, 20 L.Ed. 192; State ex rel. Henning v. Williams, 345 Mo. 22, 131 S.W. 2d 561. Those cases do hold that a corporation may, for certain purposes, such as service of process and liability for payment of personal property taxes, have a residence in a state other than the state of incorporation. However, in each of those cases it was held *that the legislature had intended to include foreign corporations as residents of the state for the particular purpose involved.* See State ex rel. Northwestern Mut. Fire Ass'n v. Cook, 349 Mo.

225, 160 S.W.2d 687, 689 et seq. An examination of the wording of the Missouri registration statutes reveals nothing to indicate an intention to treat foreign corporations as residents of the State of Missouri or of any state other than the state of incorporation. Section 301.270 differentiates between residents and nonresidents and grants certain privileges to nonresidents not permitted to residents of the State. The very purpose of § 301.270 is to permit the use of our highways without registration by a class described as nonresidents, which are defined by § 301.010 as residents of a state other than Missouri. Presumably, therefore, foreign corporations are included in this definition of nonresidents, as no intention on the part of the legislature to exclude them can be found in the statute. Similarly, a review of the motor vehicle registration laws of Oklahoma (Okla.Stat.Ann., Title 47, § 22.5), New Jersey (N.J.Rev.Stat., Title 39, Ch. 3, Art. 20), New York (McKinney's Consol.Laws N.Y., c. 71, Vol. 62A, Art. 3, § 11, Vehicle and Traffic Laws) and Pennsylvania (Purdon's Penna.Stat.Ann., Title 75, § 272) reveals nothing to indicate an intention to recognize foreign corporations as residents of those states for the purposes of their motor vehicle registration laws. (Concededly, the law of Kentucky [Baldwin's Ky.Rev.Stat.1955, §§ 186.050, 186.055] is not clear, as that state is a party to a reciprocal agreement with ten other states, but, as stated, the agreement does not include Missouri. It appears that Kentucky recognizes licensing in the state of domicile, not on the basis of residence in that state, but on the basis of reciprocal contract.)

Respondents also cite certain provisions of the Public Service Commission Act especially §§ 390.031(11) and 390.041, which they contend evidence an intent that those sections consider the established locale of operations of motor vehicles as controlling criteria. They also direct our attention to § 386.220 (of the Public Service Commission Act) in support of their contention

that the terms "resident" and "nonresident", as found in § 301.270, should be construed to refer to commercial or business situs residence. Section 386.220 authorizes the Public Service Commission to enter into reciprocity contracts with officials of other states "to the end that any motor carrier of passengers or property who or which is a nonresident of the state of Missouri and operates motor vehicles into, out of, or through this state as a for hire motor carrier and who has complied with the laws of the state of his or its residence and paid all fees required by the state of his or its residence shall not be required to pay fees prescribed in section 390.110, RSMo 1949."

It must be borne in mind that the motor vehicle registration laws, with which the instant action treats, are completely distinct and separate from the regulatory laws administered by the Public Service Commission and that the "licenses" issued by the P.S.C. to motor carriers have no connection whatever with fees (also called licenses) required by the registration laws. The former deal with every motor vehicle operating upon the highways of this State; the P.S.C. laws operate exclusively upon carriers. Concededly, the P.S.C. has no jurisdiction whatever over the former. This is exemplified in the deposition of John Randolph, former counsel for the Commission, wherein he unequivocally stated that the agreements made with carriers, including Riss, with reference to the "licensing" of the motor vehicles used by carriers in this State did not purport to extend to the registration of such vehicles under §§ 301.020 and 301.270.

And, finally, respondents cite Section 301.120, which reads:

"When the owner of a motor vehicle moves the vehicle to another state, he shall return the license plate to the director of revenue within ninety days or upon the expiration of the period of reciprocity granted by the new state of residence; or if the owner of a mo-

tor vehicle ceases to operate the vehicle in Missouri, he shall return the license plate to the director of revenue within ninety days."

They insist that this provision "definitely attaches the matter of licensing to circumstances connected with the situs of operation of the licensed vehicle rather than the domiciliary residence of the owner." The statute, if not an anachronism, in practice is notable only by reason of its nonobservance. Respondents are not charged with any violation of it; neither do they claim ever to have considered its provisions in their operations in this state; nor that they have complied with its provisions. In fact, it seems apparent they discovered it only recently. Carefully read, the statute seems to mean no more than that when an owner of a vehicle licensed in Missouri no longer has any lawful right to use a Missouri license plate theretofore issued, it should be returned to Missouri; primarily, perhaps, its purpose was to prevent lapsed Missouri license plates from being used on automobiles for which they were not issued. But, whatever its purpose, it sheds no light upon the plain and unambiguous language of the particular statutes here under consideration, to which we now direct our attention.

■ The bald facts then are that Riss is incorporated under the laws of Colorado and TM&E was incorporated under the laws of Illinois, yet not one of the vehicles operated by either of them upon the highways of this State was registered in either the State of Colorado or the State of Illinois. Therefore, the essential question is: Where is the *residence* of the "owner" of the vehicles here involved within the meaning of the reciprocity statute, § 301.270, which, by express terms, limits reciprocity to a *vehicle registered in the state of which the owner is a resident*?

■ Section 301.010 of the motor vehicles registration laws defines a nonresident to be "a resident of a state or Country

other than state of Missouri." The general rule is clear that a corporation is a resident of the state of its incorporation and only of that state, although its officers and stockholders may reside elsewhere, and though it may do business in other jurisdictions. State ex rel. Northwestern Mut. Fire Association v. Cook, 349 Mo. 225, 160 S.W.2d 687, 689; Fletcher Cyclopedia Corporations, Perm.Ed., 1931, Vol. 8, § 4025, page 435. That text, at page 440, elucidates as follows:

"The rule is also well settled that the legal existence, the home, the domicile, the habitat, the residence, the citizenship of the corporation can only be in the state by which it was created, notwithstanding it may lawfully do business in other states, therefore as to all other states it is a foreign corporation, unless it is completely domesticated so as to become a new creation, and at least for jurisdictional purposes corporations will be conclusively presumed to be citizens and residents of the state by which they were created. The committee of the American Law Institute on the Restatement of the Conflict of Laws has adopted this statement as to the domicile of a corporation. Not only is the fact of the citizenship, habitancy and residence of a corporation settled beyond the point of refutation, but the courts, with but few dissenting voices, assent to the proposition, * * *."

And on page 443, the text continues:

"It may do business and maintain agencies in another state if its charter permits, and that right is not denied by local law; its officers, directors and stockholders may reside therein; it may be denominated a domestic corporation, be vested with citizenship and be given a local residence by the statutes of such state, yet it continues to be a citizen, inhabitant and resident only of the state by which it was created except so far as the operation of

local laws requires that it be regarded as having a local citizenship, habitancy, or residence, as the case may be; * * *."

The universality of the rule thus announced, as it applies to motor vehicle registration under statutes worded similarly to the Missouri statutes, is stated in 20 C.J.S. Corporations § 1794, page 17, and also followed in Vandevoir v. Southeastern Greyhound Lines, 7 Cir., 152 F.2d 150, 152; Western Express Co. v. Wallace, 144 Ohio St. 612, 60 N.E.2d 312; and State v. Garford Trucking, Inc., 4 N.J. 346, 72 A.2d 851, 16 A.L.R.2d 1407. In the latter case, Garford, a New Jersey corporation operating as a motor carrier in 12 different states, including Rhode Island, operated one of its vehicles based and registered in Rhode Island into and through New Jersey. Following acquittal of operation of an unregistered vehicle in New Jersey, the Supreme Court of that state, upon appeal by the state, held, 72 A.2d loc. cit. 854:

"Garford is not a 'nonresident' of New Jersey; it is domiciled and resident here. A corporation created and existing under the laws of New Jersey may have a 'commercial domicile' or 'business situs' elsewhere for taxation and other purposes; but it is nonetheless domiciled and resident in the state of its creation, for a corporation is domiciled in the state or sovereignty under which it has its being, and there also it has the residence which is inseparable from domicile. A corporation lives and dwells in the jurisdiction whence it derives its existence, although it engages in business elsewhere under local authority. A corporate entity 'must dwell in the place of its creation, and cannot migrate to another sovereignty.'"

And further, 72 A.2d loc. cit. 855:

"By the plain terms of the [reciprocity] act, a 'nonresident' is one who is not a resident of New Jersey. Registration in a foreign jurisdiction of

the motor vehicle of a resident of New Jersey does not confer the right of free use of the highways of this state. When we consider the policy of the statute, all doubts as to meaning disappear. Free operation is purely a measure of reciprocity in favor of the nonresident owner whose state accords the same privilege to residents of New Jersey."

And finally, respondents' contention as to the meaning of our reciprocity statute, § 301.270, has been expressly denied in the case of Transport Rentals, Inc. v. Carpenter, Mo., 325 S.W.2d 745, decided by Division Two of this court on July 13, 1959, wherein we said, loc. cit. 748:

"Under the authorities of states having like statutory provisions, the word 'resident' in section 301.270, when applied to a corporate owner of a motor vehicle has reference to its citizenship or domicile in the sovereignty or state under the law of which it has its being, although it engages in business elsewhere. State v. Garford Trucking, Inc., 4 N.J. 346, 72 A.2d 851 [1–8], 16 A.L.R.2d 1407; Western Express Co. v. Wallace, 144 Ohio St. 612, 60 N.E. 2d 312, 315; 8 Fletcher, Cyclopedia Corporations, § 4025. See also State ex rel. Northwestern Mut. Fire Ass'n v. Cook, 349 Mo. 225, 160 S.W.2d 687 [2]; Herryford v. Aetna Inc. Co., 42 Mo. 148, 152; Vandevoir v. Southeastern Greyhound Lines, 7 Cir., 152 F.2d 150 [2]."

Therefore, saving only for further consideration respondents' contention of the unconstitutionality of our registration statutes when construed as above stated, we must and do hold that the privilege of reciprocity, as defined in § 301.270, is limited to the respective states of respondents' incorporation.

Respondents' contention in the latter respect is that when this court construes our motor vehicle registration statutes in the manner above indicated, we place an illegal and unreasonable burden upon interstate commerce in violation (1) of Article I, §§ 8 and 10, of the Constitution of the United States, in that such construction results in the imposition of charges for the use of our highways in interstate commerce by respondents in excess of fair compensation; and (2) of the equal protection clause of the 14th Amendment of that Constitution. In support of those contentions, respondents assert and have undertaken to establish by evidence that the cost per mile *for the acutal use* made by them of the highways of Missouri is unreasonably high.

The motor vehicle registration tax is imposed upon every owner whose motor vehicle is operated or driven upon the highways of this State, with the single exception provided in the reciprocity statute, and the fees for property-carrying vehicles, such as are involved here, are graduated according to the gross weight of the vehicle and load carried. See § 301.020 and § 301.060 (1955 Supp.). By Article IV, § 30, of the Missouri Constitution of 1945, V.A. M.S., all such fees, after the payment of the costs of collections, go to the maintenance of the Highway Department, the Highway Patrol, and to the road fund for the maintenance and construction of highways. The evidence is that there is no diversion of these funds, but that they, in fact, do go as directed by the Constitution. Furthermore, this tax is levied upon the owners of all vehicles that operate on the highways of the State of Missouri. No distinction is made between those operated in interstate commerce and those operated in intrastate commerce; both are treated exactly alike.

■ The registration fees levied under the Missouri statutes are not based upon the miles traveled but are a charge made for the *privilege* of using the highways. Aero Mayflower Transit Co. v. Georgia Public Service Commission, 295 U.S. 285, 55 S.Ct. 709, 79 L.Ed. 1439; State ex rel. Illinois Greyhound Lines v. Public Service

Commission, 341 Mo. 190, 108 S.W.2d 116, 115 A.L.R. 1097. Consequently, unless and until it be shown that the fees exceed fair compensation when the privilege has been fully utilized, the cost per mile actually traveled is of no significance. The burden of making such a showing was clearly upon respondents. Interstate Busses Corporation v. Blodgett, 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551. They failed to do so. Moreover, Riss is engaged in both intrastate and interstate commerce. The validity of Missouri's registration fees as to intrastate operations was not challenged and, since no additional charge was made because of respondents' interstate operations, it is clear that they have failed to make any showing that the fees exacted in Missouri deprive them of any rights under the commerce or equal protection clauses of the Federal Constitution.

 Following an extended analysis of the evidence and the law applicable thereto, our Special Commissioner found that respondents were in violation of the laws of Missouri when their vehicles operated over the highways of Missouri without Missouri licenses and with licenses issued by the States of New York, New Jersey, Pennsylvania and Kentucky; that these violations were constant and repeated over a period of almost two years; that they constituted an abuse of the franchises granted respondents and a violation of the trust imposed in them by the State; and that the State is therefore entitled to judgment revoking the privileges heretofore granted each respondent or the imposition of such penalties as, in the sound discretion of the court, are consistent with the law and the facts. Our independent review of the law and the facts leads inevitably to the same conclusion.

We cannot agree, however, with the recommendation of the Commissioner that ouster should be stayed upon condition of the payment of a fine by each respondent in the sum of $25,000 and the costs of this proceeding. Rather do we agree with the contention of relator that if fines are to be assessed as a condition of stay of ouster the amount thereof suggested by the Commissioner would be grossly inadequate.

The essential portions of the evidence adduced have been set forth at length. The mere recital thereof portends and leads to the conclusions following:

(1) That respondents did not have good reason to believe and did not believe that they were acting in compliance with the registration laws of Missouri in the operation of their motor vehicles licensed in other states upon the highways of Missouri from 1950 until the filing of this action in January, 1956;

(2) That, following their conferences with General Dalton in 1954, respondents did not have good cause to believe and did not believe that the law enforcement officials of this State would accept and agree to registration of their motor vehicles in any manner other than as required by §§ 301.020 and 301.270, as hereinabove construed;

(3) That respondents did not have good reason to believe and did not believe that upon presentation and hearing of properly joined issues of law and fact (as was done in the instant case), the courts of this State would ultimately construe Missouri's registration statutes in any of the alternative respects contended for by them; and

(4) That the actions brought by respondents for the alleged purpose of procuring an adjudication of the controversy existing between them and the law enforcement officers of Missouri were not motivated in good faith but instead were instituted for the express purpose of delaying such an adjudication, during which they would be enabled (as they thought) to continue unlawful operation of such vehicles with impunity.

The foregoing findings definitely warrant the drastic action of ouster unless we further determine that through means of lesser penalties by way of fines respond-

ents can be saved of ouster and henceforth will not engage in deliberate and studied violation of the laws of Missouri. State on inf. Taylor v. American Insurance Co., 355 Mo. 1053, 200 S.W.2d 1, 42–43 [26] and cases therein cited. The question of whether ouster should be stayed upon condition of payment of fines and, if so, the amount of such fines has been given much thought, both by the Special Commissioner and this Court.

Following the report of the Special Commissioner, respondents, on February 10, 1959, filed in this court their joint motion in which, without admission of liability, they sought to dispose of the case by payment of a total fine of $25,000 and accrued costs. That motion, predicated in part upon respondents' allegedly embarrassed financial condition, further alleged:

"The evidence as stated in the Report disclosed that immediately upon filing of this information in Quo Warranto, or very shortly thereafter, Respondents in the operation and licensing of their motor vehicles complied with the interpretation of the Missouri licensing law adopted and urged by Relator, namely, licensing in the state of incorporation where that State has reciprocity with Missouri."

It further alleged that certain amendments had been made to the registration laws in 1957, and that:

"Such amendments of the licensing statutes relating to motor vehicles provide for the development through a State Reciprocity Commission of the approximate situation in respect to licensing of motor vehicles engaged in interstate transportation such as those of Respondents as, Respondents contended was appropriate under the Statutes in effect prior to such amendments. Therefore the issues in the present litigation have, insofar as this action being a test case is concerned,

become moot in respect to Relator and the State of Missouri."

The motion was denied, but we do construe it, in effect, as a solemn avowal that henceforth respondents will not deliberately violate the motor vehicle registration laws of Missouri. So construing the recitals of that motion, it appears that the ends of justice may be served by the imposition of fines as a condition of stay of ouster.

■ Both relator and the Special Commissioner have made well considered computations as to the amount of money of which the State was deprived by respondents by virtue of respondents' unlawful operation of their motor vehicles in Missouri in 1954 and 1955. We need not detail those computations; they are not challenged. They show that the revenue of which the State was deprived approximates $250,000 in fines, exclusive of costs, and in excess of $300,000 in loss of motor vehicle registration fees. Of course, any fine imposed as a condition of stay of ouster should not be predicated upon the theory of collection of the moneys of which the State has been deprived; that is not the office of the writ. However, the extent to which respondents were enriched by their continued and constant violations of the registration laws of Missouri is somewhat indicative of the extent to which they should be penalized. Their ultimate enrichment should not be such as to make their willful misconduct a pleasingly profitable venture; instead, it should be such as is fairly commensurate with the seriousness with which we consider their long continued malfeasance. Our conclusion is that the fine assessed against each respondent as a condition of stay of ouster should be fixed at $50,000.

It is, therefore, ordered and adjudged that writ of ouster issue as to each respondent, such ouster to be stayed upon condition of the payment of a fine by each respondent in the amount of $50,000 and the costs of these proceedings within thirty

days; in default of which, or any part thereof, let the writs of ouster and execution for costs issue.

EAGER, J., not sitting; all others concur and LEEDY, J., concurs in separate opinion.

LEEDY, Judge (concurring).

I concur in the principal opinion except portions of its separately numbered conclusions whereon the Special Commissioner's recommendations as to penalty were rejected. In particular, while I agree to the construction of the registration statutes which the opinion places on them, for me, that question has not been one entirely free from doubt. Nor am I willing to attribute to respondents' counsel improper motives and want of good faith in prosecuting the actions brought by them for the adjudication of the controversies between respondents and licensing authorities. Believing that ouster is warranted irrespective of these considerations, I would defer to the recommendations of the Special Commissioner as to the amount of fine to be imposed, although I do not dissent to the assessment of the larger amount fixed by the opinion.

On Motion for Rehearing

PER CURIAM.

Respondents, in their motion for rehearing state:

"3. The judgment of ouster issued by the Court is repugnant to Article I, Sections 8 and 10 of the Constitution of the United States in that upon its face it is unlimited and thereby purports to suspend an interstate motor carrier's right, as granted by the Interstate Commerce Commission, to operate in interstate commerce within the state. The judgment in this respect is in direct conflict with the decision of the United States Supreme Court

in Castle v. Hayes Freight Lines (1954), 384 [348] U.S. 61, 75 S.Ct. 191, 99 L.Ed. 668 [68]."

The Castle case was not referred to in the brief filed by respondents in this court and, therefore, was not discussed in the opinion. It was, however, presented to and considered by the Special Commissioner. He said of it:

"That case did not involve the revocation of a franchise granted by the state, and the court did not hold that the State of Illinois could not revoke a franchise issued by the state to an interstate motor carrier. Instead, the court held that the state could not suspend the right of an interstate motor carrier to use the highways of the state. The case is not in point."

In the Castle case, the Supreme Court of the United States considered the validity of an Illinois statute providing for suspension of ninety days to one year of the right of interstate motor carriers to the use of Illinois highways as punishment for repeated violations of state highway regulations. The statute was held invalid on grounds that the right of the defendant carrier to use Illinois highways for *interstate transportation* of goods cannot be suspended by Illinois.

■ The Supreme Court of Missouri has long since recognized that the State of Missouri cannot take from any corporation the right to engage in interstate commerce within its borders. In State ex inf. Hadley v. Standard Oil Company, 218 Mo. 1, 116 S.W. 902, 1018 (affirmed 224 U.S. 270, 32 S.Ct. 406, 56 L.Ed. 76), we said:

"The Legislature has no power or authority to prevent respondents from carrying on interstate trade,' for the reason that power is vested in and rests with Congress; but it does possess the power to authorize the courts to forfeit the charters of all corporations organized and existing under the laws of this state for the usurpation

of powers not granted to them, or for misuser or nonuser of those granted, and it is wholly immaterial whether those corporations are engaged in interstate commerce or not. The Legislature also possesses the undoubted authority to revoke or forfeit the license issued to any foreign corporation authorizing it to do an intrastate business in this state. The revocation of such a license in no manner interferes with interstate commerce. The authority to conduct such business is obtained under the acts of Congress, and not by virtue of the laws of the state. A license from the state can neither confer nor take away the authority or right of a foreign corporation to carry on interstate commerce; and, that being true, we are unable to see in what possible manner the forfeiture of such a license, that is, a license which only authorizes a foreign corporation to do an intrastate business, can possibly offend against section 8 of article 1 of the federal Constitution, which only applies to interstate commerce."

See also State ex inf. Major v. Arkansas Lumber Company, 260 Mo. 212, 169 S.W. 145, 171.

The information upon which this case was tried does not ask revocation or suspension of the right of respondents to engage in interstate commerce and neither does the judgment purport to do so. To the contrary, the information asks only "that respondents and each of them be ousted from their privilege of exercising their corporate franchise within the State of Missouri, and for such other and further relief as to the Court may seem meet and just in the premises." The opinion rendered by this court, after consideration of the facts, holds that "the State is therefore entitled to judgment revoking the privileges heretofore granted each respondent [by the State of Missouri] or the imposition of such penalties as * * * are consistent with the law and the facts." The judgment rendered by this court recites:

"Now at this day, comes the informant, the State of Missouri, by the Attorney General, and the respondents, by their attorneys, and the Court having considered the evidence, and the report of the Special Commissioner herein, and being now fully advised of and concerning the premises, and having announced and filed its opinion, doth find * * *

"(2) that respondents were in violation of the laws of Missouri in the operation of their motor vehicles over the highways of Missouri without proper Missouri registration licenses; that said violations were constant and repeated over a period of almost two years and constituted an abuse of the franchises granted respondents and a violation of the trust imposed in them by the State.

"It is therefore considered and adjudged by the court that a writ of ouster issue as to each respondent, such ouster to be stayed, upon condition of the payment of a fine by each respondent in the amount of Fifty Thousand Dollars ($50,000.00) to be paid to the clerk of this court within thirty days from the date of this judgment, * * *," etc.

It is clear, therefore, that the judgment rendered herein, considered in context with the pleadings and the evidence, is not intended to and does not affect any right granted respondents by the Federal Government to engage in interstate commerce or bar them from user of the highways of Missouri in such commerce.

The remaining assignments of the motion for rehearing have also been considered and are found to be without merit.

Rehearing denied.